# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### WICHITA FALLS DIVISION

| | | |
|---|---|---|
| ROBIN INGE, | § | |
| ON BEHALF OF D.J.I., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 7:09-cv-95-O |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This case has been referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b) and the order of the District Court filed on June 17, 2009. The findings, conclusions, and recommendations of the Magistrate Judge, as evidenced by his signature thereto, are as follows:

Procedural History: On October 19, 2005, an application for supplemental security income ("SSI") was filed on behalf of D.J.I., a minor, by his mother Robin Inge, alleging a disability onset date of December 15, 2000. (Administrative Record (hereinafter "Tr." at 15, 145). The first month for which SSI benefits can be paid is the month following the month in which the application was filed, regardless of how far back in time the disability may extend. 20 C.F.R. § 416.335. Plaintiff alleged disability due to attention deficit hyperactivity disorder (ADHD), intermittent explosive disorder, bipolar disorder, and a speech problem. (Tr. 33-34, 145). The claim was denied by the state agency initially and on reconsideration, after which she requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 15). A hearing was held

before the ALJ on January 14, 2008, at which Plaintiff appeared with counsel and testified on behalf of D.J.I.  (Tr. 452-481).  The ALJ also received the testimony of D.J.I.  *Id*.  On June 18, 2008, the ALJ denied Plaintiff's request for benefits.  (Tr. 15-25).

Plaintiff timely requested a review of the ALJ's decision by the Appeals Council, and on April 20, 2009, the Appeals Council denied her request for review.  (Tr. 4-7).  Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.  *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).  Plaintiff filed her federal complaint on June 17, 2009.  Defendant filed an answer on December 7, 2009.  On February 12, 2010, Plaintiff filed her brief, followed by Defendant's brief on April 13, 2010, and Plaintiff's reply on April 28, 2010.

Standard of Review - Social Security Claims:  When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of: (1) whether the ALJ's decision is supported by substantial evidence in the record and (2) whether the proper legal standards were applied in evaluating the evidence.  *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).  In determining whether substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment.  *Villa*, 895 F. 2d at 1022 (citations omitted).  Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  *Perez v. Barnhart*, 415 F.3d 461(5th Cir. 2005).

Discussion:      To prevail on a claim for a child's SSI benefits,[1] the claimant bears the burden of proving that he is disabled, which is defined as having "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The regulations set forth a three step process for determining whether a child is disabled.  *See* 20 C.F.R. § 416.924.  A child will be found disabled only if: (1) the child is not doing substantial gainful activity, (2) the child has a physical or mental impairment or combination of impairments that is severe, and (3) the severe impairment or combination of impairments satisfies the duration requirement and meets, medically equals, or functionally equals a listed impairment.  § 416.924(a); *see* also 20 C.F.R. Part 404, Subpt. P., App. 1 ("The Listings").

First, substantial gainful activity is defined as work activity that involves doing significant physical or mental activities and that is done for pay for profit.  § 416.972(a)-(b).  Second, an impairment meets the regulatory definition of "severe" unless the impairment is not "medically determinable" or is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."  § 416.924(c).  The third step of the regulatory test for disability is met if a claimant's impairment fully satisfies the criteria for any impairment listed in Appendix 1 to Subpart P of Part 404 of the regulations.  If the claimant's condition does not meet the criteria of any listing, the child's impairment may nevertheless medically equal a listing if "it is at least equal in severity and duration to the criteria of any listed impairment."  § 416.926.  As an alternative, the claimant's impairment may functionally equal a

---

[1]  The Social Security Act defines a child as a person "under the age of eighteen."  42 U.S.C. § 1382c(a)(3)(C)(i).

listing if it causes marked limitations in two of six domains of functioning listed in § 416.926a(b)(1) or an extreme limitation in one domain. § 416.926a(d).

In the present case, the ALJ proceeded to step three. He found that D.J.I. had not engaged in substantial gainful activity at any time relevant to the decision, and had a combination of severe impairments, to wit: "Bipolar Disorder, Attention Deficit Hyperactivity Disorder (ADHD), and Anxiety", but that the combination of his impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, nor did they functionally equal the listings in 20 C.F.R. §§ 416.924(d) and 416.926(a). (Tr. 18). The ALJ made findings as to D.J.I.'s limitations in each of the six function domains: less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and the ability to care for himself; and no limitations in moving about and manipulating objects and health and physical well-being. (Tr. 20-25, *see also* 20 C.F.R. § 416.926(a)). He found that D.J.I.'s impairments did not result in either "marked" limitations in at least two domains of functioning or "extreme" limitation in one domain of functioning, and therefore denied his request for SSI.

Plaintiff raises two arguments in her brief. First, she argues that the ALJ failed to find D.J.I.'s respiratory, speech, and intermittent explosive behavior to be severe impairments. Second, she argues that the ALJ's step three findings that D.J.I.'s impairments did not meet or functionally equal a listing were not supported by substantial evidence.

4

Relevant Medical evidence:

Physical Impairments

D.J.I. was born on September 9, 1996. (Tr. 18). He alleged a disability onset date of December 15, 2000. (Tr. 145). On October 20, 2002, D.J.I. complained of asthma and a "barking cough" lasting two days during a visit to the Wilson N. Jones Medical Center. (Tr. 332-334). He was diagnosed with asthma and prescribed medication to treat his conditions. *Id.* At that appointment, at which time D.J.I. would have been approximately six years old, he was noted as combative and not wanting treatment. (Tr. 335).

On September 28, 2004, upon complaints of a "croupy cough", D.J.I. was examined by Dr. J. Fernando Mandujano, M.D. (Tr. 355). Dr. Mandujano found his respiratory functions normal; however, a computerized tomography (CT) scan of his sinuses indicated reactive airway disease, allergic rhinitis, and tracheobronchitis. (Tr. 356-358, 361). The doctor prescribed a treatment plan including Clarinex,[2] Singulair,[3] and Flovent[4] daily, as well as Albuterol,[5]

---

[2] "Clarinex is an antihistamine used to relieve the symptoms of seasonal and perennial allergic rhinitis, such as watery and itchy eyes, runny nose, sneezing, or hives. It works by blocking the action of histamine, which reduces the symptoms of an allergic reaction."

[3] "Singulair is a medicine called a leukotriene receptor antagonist. It works by blocking substances in the body called leukotrienes. Blocking leukotrienes improves asthma and allergic rhinitis. Singulair is prescribed for the treatment of asthma, the prevention of exercise-induced asthma, and allergic rhinitis (sneezing, stuffy nose, runny nose, itching of the nose, and outdoor and indoor allergies)."

[4] "Flovent HFA contains a medicine called fluticasone propionate, which is a synthetic corticosteroid. Corticosteroids are natural substances found in the body that help fight inflammation. Corticosteroids are used to treat asthma because they reduce airway inflammation. Flovent HFA is used to treat asthma in patients 4 years of age and older. When inhaled regularly, Flovent HFA also helps to prevent symptoms of asthma."

[5] "Drugs containing albuterol are prescribed for the prevention and relief of bronchial spasms that narrow the airway. This especially applies to the treatment of asthma. Some brands

Robitussin, and Azelastine[6] as needed.

On January 27, 2006, D.J.I. was evaluated by Dr. Joseph A. Lipscomb, M.D. at Texoma HealthCare System for complaints of cough, chest tightness, and wheezing.  (Tr. 225).  His mother reported that he was on asthma medication, but had run out and had not taken it for several months.  *Id.*  Dr. Lipscomb assessed D.J.I. with asthma with acute exacerbations.  (Tr. 226).  He prescribed asthma medication as well as nasal spray for his allergies.  *Id.*  On March 3, 2006, D.J.I. returned to Texoma with complaints of an asthma flare-up, including a "croupy cough", stuffiness, and red circles under his eyes.  (Tr. 428).

On February 1, 2007, Plaintiff Inge reported to Dr. Judy Cook, M.D. that D.J.I. had not experienced any problems with asthma and had not been sick during that winter.  (Tr. 432).  On April 2, 2007, at which time D.J.I. would have been approximately ten years old, Dr. Cook noted that he appeared to be having some allergy issues, but that his asthma was doing well.  (Tr. 431).

Mental Impairments

At a young age, D.J.I. witnessed the repeated sexual abuse of his three step-siblings by his own father.  (Tr. at 258, 474).  During these episodes he tried to protect his older brothers by

---

are also used for the prevention of bronchial spasm due to exercise.

[6] "Astelin [generic name: Azelastine hydrochloride] is a prescription nasal spray medicine. Astelin is an antihistamine used to relieve symptoms of seasonal allergies in adults and children 5 years and older. Additionally, in people 12 years and older, it relieves symptoms caused by environmental irritants such as perfumes, cigarette smoke, exhaust fumes, chemical odors, and cold air. These symptoms include sneezing; itchy, runny, or stuffy nose; and postnasal drip."

All prescription drug definitions located at the Physician Desktop Reference Online, available at: http://www.pdrhealth.com/.

striking his father. (Tr. 258). In 2000, his father was incarcerated for the crimes, and since that time D.J.I. has lived apart from his older brothers. (Tr. 474, Pl. Br. 4). As he was born in 1996, these events would have taken place when he was approximately four years old and younger.

From February 2005 through January 2006 D.J.I. received psychological counseling from Dr. Vivian A. Collins, Ph.D., a psychiatrist. (Tr. 371-393). During that time period, D.J.I. exhibited aggressive and moody behavior in school and his grades were getting worse. (Tr. 372-374, 385, 390). Dr. Collins' treatment plan included increasing positive thoughts and emotions, anger control, and adaptive expressions of anger; while decreasing negative thoughts and emotions and angry outbursts. (Tr. 383).

On February 2, 2005, Dr. Ronald P. Gleason, M.D., a psychiatrist, conducted a psychological evaluation of D.J.I. (Tr. 239-240). He noted that D.J.I.'s mother noted no difference between when he did and did not take his medications. (Tr. 239). Dr. Gleason opined that D.J.I.'s thought process was clear, with no suicidal or homicidal ideations or plans; that he was oriented with normal memory; that he had poor concentration, intellectual functioning, insight, and judgment; and diagnosed him with ADHD and post-traumatic stress disorder (PTSD). (Tr. 240). Dr. Gleason continued to treat D.J.I. on a monthly basis from March 2005 through February 2006. (Tr. 231-238).

On August 8, 2005, Dr. Collins completed a children's functional equivalence questionnaire, in which she listed D.J.I.'s impairments as severe bipolar disorder and ADHD, and noted chronic episodic depression, poor grades, and physical expressions of anger. (Tr. 395-396). His symptoms included "crying, withdrawal, hopelessness, hitting, yelling, kicking, impaired ability to concentrate, poor impulse control." (Tr. 395). Despite the adverse findings,

Dr. Collins opined that D.J.I.'s symptoms did not cause him to regularly miss school, cause

difficulty in moving or manipulating objects, or cause problems with self-care. (Tr. 395-396).

She opined that his symptoms did not preclude him from engaging in social activities, but did

impair his social relationships, causing feelings of rejection and loneliness. (Tr. 395). Dr.

Collins stated "[his] mood is getting worse as he gets older. [D.J.I.'s] mother complies w[ith]

treatment goals. Despite years of treatment [and] several providers, little improvement is noted."

(Tr. 396).

D.J.I.'s SSI application was filed on October 19, 2005. (Tr. 15, 145). On October 28,

2005, Dr. Paul M. Lee, M.D., a psychiatrist, completed a psychiatric evaluation of D.J.I. upon

his admission to Glen Oaks Hospital. (Tr. 281-282). Dr. Lee noted that D.J.I. was 9 years old

and in the fifth grade at the time. *Id.* D.J.I. voluntarily reported to Glen Oaks after exhibiting

extremely aggressive behavior at school and home, including hitting, biting, and kicking. (Tr.

281). His thought processes appeared normal and he was not having auditory or visual

hallucinations or delusions. *Id.* His mood was depressed and irritable, and his insight and

judgment were poor. *Id.* Dr. Lee opined that D.J.I. had suicidal and homicidal ideations. *Id.*

D.J.I. was diagnosed with bipolar disorder, ADHD, asthma and gastroesophageal reflux disease,

and problems at school. (Tr. 282). He was diagnosed with a GAF score of 30. (Tr. 282).[7] On

October 29, 2005, the next day, D.J.I. was diagnosed with a GAF of 35. (Tr. 406).[8] Plaintiff

scheduled follow-up appointments with Dr. Collins and with Dr. Gleason, and D.J.I. left Glen

---

[7] GAF of 21-30 indicates behavior is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. *See* American Psychiatric Ass'n, DSM-IV.

[8] GAF of 31-40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.*

8

Oaks against medical advice on October 29, 2005.  (Tr. 284).

On January 5, 2006, D.J.I.'s mother reported to Dr. Gleason that the medication he was on was effective in helping with his anger management.  (Tr. 231).  On January 27, 2006, D.J.I. was evaluated by Dr. Lipscomb at Texoma HealthCare System for complaints of cough, chest tightness, and wheezing.  (Tr. 225).  During the appointment, Dr. Lipscomb assessed D.J.I. with asthma, as well as severe behavioral problems and ADHD; however he described D.J.I.'s bipolar disorder as "questionable". (Tr. 226).  In February 2006, D.J.I.'s mother reported to Dr. Gleason that he was doing better.  (Tr. 231).

On March 1, 2006, Dr. C. Robin McGirk, Ph.D., a consultative psychologist, conducted a psychological evaluation of D.J.I.  (Tr. 258-262).  D.J.I's mother stated that the reports of her son's behavior that led to his hospitalization at Glen Oaks "had been grossly exaggerated at the time".  (Tr. 259).  Dr. McGirk noted that D.J.I. attended school, functioned at grade level, and received speech therapy at school for his articulation problems.  *Id.*  He opined that D.J.I. had logical, organized, and coherent thoughts, with no evidence of delusional processes.  (Tr. 260).  His mood was euthymic, ranging from sullen to responsive humor.  *Id.*  He opined that D.J.I.'s medication made him sleep more than usual.  *Id.*  Dr. McGirk diagnosed him provisionally with anxiety disorder and behavior disorder, and assigned a GAF score of 50.[9]  (Tr. 261-262).

On March 17, 2006, Dr. Robert White, Ph.D., a disability determination services (DDS) non-examining psychologist, reviewed the medical evidence and completed a childhood disability evaluation form.  (Tr. 241-246).  He opined that D.J.I. had the impairments of ADHD, bipolar disorder, anxiety disorder, and articulation delay.  (Tr. 241).  He opined that the

---

[9] GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *See* American Psychiatric Ass'n, DSM-IV.

impairments were severe, but did not meet, medically equal, or functionally equal a listing.  (Tr. 241).  He considered the six domains of functioning.  (Tr. 243-244).  He found no limitations in two domains:  moving about and manipulating objects, and health and physical well-being.  *Id*. He found less than marked limitations in the other four domains: acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself.  *Id*.  Dr. White opined that D.J.I.'s limitations were not fully supported by the medical evidence of record.  (Tr. 246).

On March 22, 2006, Dr. Lipscomb opined that D.J.I. was alert, active, and in no distress. (Tr. 221).  He continued D.J.I. on Concerta[10] to treat his ADHD.  *Id*.  On April 6, 2006, D.J.I. reported that "everything is finally balanced" and earlier issues at school and home were "great" with "no complaints".  (Tr. 426).  Dr. Lipscomb lowered D.J.I.'s dosage of Concerta due to weight loss and decreased appetite.  *Id*.

On September 7, 2006, Dr. Caren Phelan, Ph.D., a non-examining DDS psychologist, reviewed the medical evidence and completed a childhood disability evaluation for D.J.I.  (Tr. 209-214).  The doctor found that D.J.I. had ADHD, intermittent explosive disorder, bipolar disorder, and a speech problem.  (Tr. 209).  However, the report found no limitations in three of the functional domains: acquiring and using information, moving about and manipulating objects, and health and physical well-being; less than marked limitations in two of the functional domains: attending and completing tasks, and interacting and relating with others; and marked limitations in one domain: caring for yourself.  (Tr. 211-212).  In the explanations section for "caring for yourself", Dr. Phelan wrote "admit to psych hospital 10/05 due to aggressive

---

[10]  Concerta, Generic name Methylphenidate hydrochloride, is used for the treatment of attention-deficit/hyperactivity disorder (ADHD).  http://www.pdrhealth.com/.

behavio[r] but overall has adequate emotional and behavioral self control." (Tr. 212). Overall, Dr. Phelan opined that D.J.I. had severe impairments but that they did not meet, medically equal, or functionally equal the listings. (Tr. 209). Dr. Phelan opined that D.J.I.'s "symptoms and allegations [were] not wholly supported by medical evidence." (Tr. 214).

On October 9, 2006, Dr. Judy Cook, M.D., a psychiatrist, evaluated D.J.I. (Tr. 436-438). She described him as "a pleasant young man who can smile readily, but is clearly a child with serious allergies". (Tr. 437). She diagnosed him with intermittent explosive disorder. (Tr. 438). Her initial treatment plan included medications for D.J.I.'s respiratory issues. *Id*. On October 30, 2006, Dr. Cook conducted a follow-up evaluation. (Tr. 435). She found D.J.I. to be mildly improved and better able to listen and interact. *Id*. She assigned a GAF of 58 and kept him on his then-current medication regimen of Singulair, Advair, Albuterol inhaler, and Flovent for his asthma, and Symmetrel and Zovirax.[11] *Id*. Dr. Cook next evaluated D.J.I. on November 28, 2006. (Tr. 434). He was somewhat agitated and would not discuss how he was doing. *Id*. His mother noted that his report cards were good, although his homework fluctuated, and he still had issues with authority, listening, and angry outbursts. *Id*. Dr. Cook prescribed Lamictal[12] to help

---

[11]   Symmetrel, generic name Amantadine, "is an antiviral. It is used to prevent or treat certain influenza (flu) infections (type A). It may be given alone or along with flu shots. Amantadine will not work for colds, other types of flu, or other virus infections. Amantadine also is an antidyskinetic. It is used to treat Parkinson's disease, sometimes called paralysis agitans or shaking palsy. It may be given alone or with other medicines for Parkinson's disease. By improving muscle control and reducing stiffness, this medicine allows more normal movements of the body as the disease symptoms are reduced. Amantadine is also used to treat stiffness and shaking caused by certain medicines used to treat nervous, mental, and emotional conditions."

Zovirax is an antiviral medication prescribed to treat chickenpox, shingles, and other herpes infections. *See* http://www.pdrhealth.com/.

[12]   "Lamictal is used either alone or in combination with other medicines to treat seizures in adults and children 2 years and older. Lamictal is also used for maintenance treatment of

with the bipolar disorder.  *Id*.

On January 3, 2007, Dr. Cook assessed D.J.I. as improving physically and behaviorally. (Tr. 433).  His mother reported that he seemed happier, less aggressive, less fidgety, and less nervous.  *Id*.  On February 1, 2007, his mother reported to Dr. Cook that his grades were up "a lot".  (Tr. 432).  She reported that he responded positively to the bipolar medication.  *Id*.  Dr. Cook opined that he was improving physically and behaviorally and continued him on his medication regimen.  *Id*.  On April 2, 2007, D.J.I.'s mother reported that he was doing well at school and at home and staying out of trouble.  (Tr. 431).  Dr. Cook assessed him as improving physically and behaviorally, and continued him on his medication regimen.  *Id*.

**First,** D.J.I. argues that the ALJ failed to find his respiratory, speech, and intermittent explosive behavior to be severe impairments.  Under the second step of the three-step sequential evaluation process, the ALJ determined that D.J.I. had the following severe impairments: Bipolar Disorder, ADHD, and anxiety.  (Tr. 18).  The ALJ found that the combination of his impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, nor did they functionally equal the listings in 20 C.F.R. §§ 416.924(d) and 416.926(a).  *Id*.  In reaching his findings on D.J.I.'s impairments, the ALJ considered the medical evidence of record, as well as reports from D.J.I.'s teacher and the testimony of Plaintiff Inge and D.J.I.

For an individual under the age of eighteen, an impairment is considered "not severe" if it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" on an individual's ability "to function independently, appropriately, and effectively in an age appropriate manner."  20. C.F.R. § 416.924(c); Social

_____

bipolar disorder to help prevent mood swings in adults 18 years and older."  *See* "Lamictal" at http://www.pdrhealth.com/.

Security Ruling ("SSR") 96-3P, 1996 WL 374181; *Sambula v. Barnhart*, 285 F.Supp.2d 815, 824 (S.D.Tex., 2002).  Plaintiff's counsel contends that the ALJ erred in applying the severity standard set forth at 20 C.F.R. § 416.924(c), without specifically referencing or applying the severity standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir.  1985).  (*See* Pl. Reply at 2).  Since this argument was first raised in Plaintiff's reply, the Commissioner did not address it in his response brief.

Plaintiff's counsel refers to decisions in the district courts of the Fifth Circuit which applied the *Stone* standard in cases of persons under age 18.  *See, e.g., Sambula*, 285 F.Supp.2d at 824; *Smith ex rel A.W. v. Astrue*, 2008 WL 2787470 at *1 (E.D.La., Jul. 16, 2008).  These decisions cited to both § 416.924 and *Stone* in reference to the applicable severity standard for minors.  *Id*.  Under SSR 96-3P, in evaluating the symptoms and effects of individuals under the age of eighteen, the same principles used in evaluating adults apply "in determining whether the impairment[s] of an individual who is under age 18 and claiming title XVI disability benefits [are] severe under 20 CFR 416.924(d)."

In *Stone v. Heckler* the court determined that "an impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's work, irrespective of age, education or work experience."  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.  1985) (citation omitted); *see also Loza v. Apfel*, 219 F.3d 378, 391-92 (5th Cir.  2000) (noting that the circuit continues to apply the definition of "not severe" from *Stone*); SSR 85-28 (S.S.A. 1985) (acknowledging and noting agreement with *Stone*'s definition of "not severe").  When a claimant's alleged impairment is mental, rather than physical, the ALJ must evaluate the plaintiff's "pertinent symptoms, signs,

and laboratory findings." § 416.920a(b)(1). If, after this review of the claimant's medical records, the ALJ determines that the plaintiff has an impairment, the ALJ is required to rate the degree of functional limitation resulting from the impairment. § 416.920a(b)(2).

The ALJ's failure to specifically reference *Stone* in his decision was, at most, harmless error. "Stone does not require a wholesale remand of all severity cases. A case will not be remanded simply because the ALJ did not use 'magic words.' We remand only where there is no indication the ALJ applied the correct standard." *See Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986) (In *Hampton*, the Fifth Circuit remanded, finding that there was no indication in the ALJ's decision that he applied the correct legal standard). In this case, the ALJ assessed D.J.I.'s alleged impairments, and his decision incorporates pertinent findings and conclusions, including the functional limitations as described by his treating and consultative doctors, and the functional limitations alleged by Plaintiff. (Tr. 19-25). While the ALJ failed to specifically reference *Stone*, he did apply the correct "slight impairment" standard for assessing severity in reaching his decision. *See Hampton v. Bowen*, 785 F.2d at 1311.

Turning to Plaintiff's argument that the ALJ failed to find D.J.I.'s respiratory, speech, and intermittent explosive behavior to be severe impairments, the court finds that the ALJ's decision was supported by substantial evidence. The record contains evidence that D.J.I. was hospitalized "about 10 times" between the time he was two weeks old and two years old, and that some of those hospitalizations were due to respiratory issues. (Tr. 436). However, those hospitalizations occurred before D.J.I.'s alleged onset date of December 15, 2000, (Tr. 436), and long before November 2005, the earliest date on which D.J.I. would be entitled to collect

benefits upon a finding of disability.[13]  The medical evidence of record indicates a history of treatment for asthma and allergies from 2002 through 2007, particularly during the winter months.  (See, e.g., Tr. 145, 225, 332-335, 356-358, 361, 431-432).  However, the evidence also indicates that D.J.I.'s asthma improved significantly with treatment between 2002 and 2006, and in February 2007 he reported having experienced no problems with asthma during the winter of 2006-2007, even without treatment.  *Id*.  Plaintiff did not allege respiratory problems in D.J.I.'s application for disability benefits.  (Tr. 33-34, 145).  The claim that respiratory issues constitute a severe impairment is not supported by the medical evidence of record.  A claimant has the burden of proving that he is disabled at step two of the sequential evaluation process, and D.J.I. has not met that burden with regards to his respiratory issues.  *See Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).

With regard to D.J.I.'s speech issues, there is substantial evidence to support the ALJ's determination that D.J.I.'s speech problems did not constitute a severe impairment.  In his decision, the ALJ found that "[D.J.I.] has a history of speech problems, but his teachers report he is able to be understood 100% of the time.  His language skills are reported to be within normal limits."  (Tr. 20).  His third grade teacher, Jessica Adams, noted in school activity reports that she always understands D.J.I.'s speech "100%", that he speaks very precisely, and "he also speaks his mind."  (Tr. 169, 172).  Ms. Adams' statements are consistent with the medical evidence of record.

Dr. McGirk, a consultative psychologist, noted that D.J.I. functioned at grade level and

---

[13]  The first month for which SSI benefits can be paid is the month following the month in which the application was filed, regardless of how far back in time the disability may extend. 20 C.F.R. § 416.335.  Plaintiff filed the application at issue on October 19, 2005.  (Tr. 15, 145). Therefore, the first month D.J.I. would be able to collect benefits would be November 2005.

received speech therapy at school for his articulation problems. (Tr. 259). Drs. Phelan and White, both DDS non-examining psychologists, opined that D.J.I.'s articulation delay was a severe impairment; however, they both found that D.J.I. had "less than marked limitations" in the domain of interacting and relating with others, (Tr. 209-214, 241-244), and both found that his limitations were not fully supported by the medical evidence of record. (Tr. 214, 246). Dr. Lee noted that his speech had normal rate, tone, and volume. (Tr. 281). Plaintiff bears the burden of proving that D.J.I.'s speech problems constitute a substantial impairment, and D.J.I.'s speech impairments failed to satisfy that burden. *See Wren, supra*, 925 F.2d at125.

With respect to his intermittent explosive behavior, Plaintiff cites to testimony from D.J.I. and herself at the administrative hearing that D.J.I.'s anger was increasing with age, (Pl. Br. 11-12; Tr. 457, 473, 477), and that his explosive behavior led to his Glen Oaks hospitalization. (Tr. 281, 436). The ALJ stated in his decision that "[Inge] said that the main issue is getting [D.J.I] to focus and concentrate, and he does not have his explosive episodes anymore." (Tr. 24). That statement appears to be contrary to Inge's testimony during the hearing, at which she stated "as he's gotten older his aggression levels have gotten stronger." (Tr. 473-474). However, Inge then testified that D.J.I. used to physically lash out at her, but "hasn't done that in probably a couple years", and related that anger problems were the reason D.J.I. ended up being hospitalized at Glen Oaks. *Id*. Her testimony regarding the anger largely related to the time period around 2005.

The medical evidence of record indicates that no fewer than eight psychiatrists weighed in on D.J.I.'s intermittent explosive anger, including three treating psychiatrists, three examining consultative psychiatrists, and two non-examining DDS psychiatrists. Throughout the evidence

of record, diagnoses of intermittent explosive disorder or physical manifestations of anger are accompanied by the diagnoses of anxiety and / or bipolar disorder.[14]  While D.J.I. argues that the ALJ failed to find his intermittent explosive disorder to be a severe impairment, the ALJ did find the bipolar disorder to be a severe impairment, and referenced D.J.I.'s intermittent explosive behavior in his findings on D.J.I.'s performance in the six functional domains.  The medical evidence of record, as well as Plaintiff's statements to both D.J.I.'s doctors and her testimony to the ALJ, support the finding that D.J.I.'s explosive behavior has decreased with age and is not a significant impairment.  Even if, *arguendo*, the ALJ did err in finding that the intermittent explosive disorder was not a severe impairment, the ALJ proceeded to step three and considered the evidence relevant to D.J.I.'s anger in his assessment of the six functional domains, and therefore any error would have been harmless.  *See, e.g.*, *Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 1988) and *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

**Second**, Plaintiff argues that the ALJ's step three findings that D.J.I.'s impairments did not meet or functionally equal a listing were not supported by substantial evidence.  Specifically,

---

[14]  Treating doctors:  Dr. Gleason diagnosed D.J.I. with ADHD and PTSD, (Tr. 240); Dr. Collins diagnosed him with severe bipolar disorder and ADHD, noting physical expressions of anger; (Tr. 395-396); Dr. Cook diagnosed intermittent explosive disorder and prescribed Lamictal, a medication commonly used to treat bipolar patients, and noted that D.J.I.'s behavior improved while taking the bipolar medication.  (Tr. 432, 434).

Examining and consultative doctors:  Dr. Lee noted extremely aggressive behavior and diagnosed him with bipolar disorder and ADHD; (Tr. 282); Dr. Lipscomb described his bipolar disorder as "questionable" and assessed that D.J.I. had ADHD and severe behavioral problems; (Tr. 225-226); Dr. McGirk diagnosed anxiety disorder and behavior disorder and noted that D.J.I.'s mother stated that the reports of behavior that led to the Glen Oaks hospitalization were "grossly exaggerated". (Tr. 259-262).

Non-examining consultative psychologists:  Dr. White opined that D.J.I. had ADHD, bipolar disorder, and anxiety disorder; (Tr. 241); Dr. Phelan opined that D.J.I. had ADHD, intermittent explosive disorder, and bipolar disorder. (Tr. 209).

he argues that the ALJ failed to find that D.J.I. met or functionally equaled listing 112.04, Mood

Disorders, and failed to properly consider the opinions of D.J.I.'s treating physicians.

At step three, the regulatory test for disability is met if a claimant's impairments fully

satisfy the criteria for any impairment listed in Appendix 1 to Subpart P of Part 404 of the

regulations.  The ALJ found that D.J.I.'s severe impairments- Bipolar Disorder, ADHD, and

anxiety-did not satisfy a listed impairment, either alone or in combination.  (Tr. 18).  If the

claimant's condition does not meet the criteria of any listing, the child's impairment may

nevertheless medically equal a listing if "it is at least equal in severity and duration to the criteria

of any listed impairment."  § 416.926.  The ALJ found that D.J.I.'s impairments did not

medically equal the listings.  (Tr. 18).  As an alternative, the claimant's impairment may

functionally equal a listing if it causes marked limitations in two of six domains of functioning

listed in § 416.926a(b)(1) or an extreme limitation in one domain.  § 416.926a(d).  The ALJ

found less than marked limitations in four domains and no limitations in two domains, and

therefore determined that D.J.I.'s impairments were not disabling within the criteria set forth in

the Regulations.  (Tr. 20-25).

Plaintiff argues that D.J.I. meets or functionally equals listing 112.04- Mood Disorders.

The listing is "[c]haracterized by a disturbance of mood ... accompanied by a full or partial

manic or depressive syndrome."  To meet that listing, D.J.I.'s impairments must meet the

requirements of both Part A and Part B of the listing.  Part A requires medically documented

persistence of major depressive syndrome, or manic syndrome, or bipolar syndrome, and lists

specific requirements detailing those syndromes.  Part B requires that for children between ages

3 and 18, the condition in Part A result in at least two of the following: marked impairment in

18

age-appropriate cognitive/communication function; marked impairment in age-appropriate social functioning; marked impairment in age-appropriate personal functioning; or marked difficulties in maintaining concentration, persistence, or pace. *See* 20 C.F.R. Part 404, Subpt. P., App. 1, listings 112.02(B)(2)(a)-(d); 112.04(B).

In his finding that D.J.I. did not suffer impairments which met, medically equaled, or functionally equaled a listed impairment, the ALJ did not identify the specific evidence on which he relied for his conclusions.  (Tr. 18).  Although it is not always necessary that an ALJ provide an exhaustive discussion of the evidence, bare conclusions, without any explanation for the results reached, may make meaningful judicial review of the Commissioner's final decision impossible. *See, e.g., Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).  However, before the absence of reasons for adverse findings requires rejection of the unfavorable decision, a court must determine whether the error was harmless. *Id.*, *citing Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 1988) and *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

There is no hard and fast rule as to the degree of specificity required in an ALJ's findings other than that set out in 42 U.S.C. § 405(b)(1).  As reiterated in *Audler,* irrespective of any error in applying the law, the critical question is whether the substantial rights of a claimant have been affected.  As related in the court's opinion, the record in *Audler* contained medical reports of the plaintiff's treating physician[15] which contained uncontroverted findings and which, if accepted by the ALJ, would have satisfied the criteria for meeting a listing for finding her to be disabled. Because the ALJ did not address or discuss the opinions of the treating physician the court found that the substantial rights of Ms. Audler were adversely affected.

---

[15]  Since the records were those of a treating doctor, § 404.1527(d) would have required the ALJ to set out the reasons for rejecting the opinions expressed by the physician.

In the present case, the ALJ's decision did not evaluate D.J.I.'s impairment under any specific listing. Guided by the standard described in *Audler*, the question is whether there was evidence in the record which was either unaddressed by the ALJ's decision or which, if accepted, stated a basis to establish a disabling impairment under listing 112.04. Assuming, *arguendo*, that D.J.I. satisfied Part A based on the medical evidence documenting diagnoses of depression and bipolar disorder, he failed to satisfy the criteria of Part B. While the records from D.J.I.'s treating physicians reveal a long history of treatment for his mental impairments with mixed success between 2002-2006, his treating physicians also stated that he was improving by 2007.

The ALJ and DDS consultative physicians evaluated D.J.I. under the six functional domains listed in 20 C.F.R. § 416.926a: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for yourself, and health and physical well-being. Listing 112.04(B) requires consideration of whether D.J.I. suffered from "marked impairment in age-appropriate cognitive/communication function; marked impairment in age-appropriate social functioning; marked impairment in age-appropriate personal functioning; or marked difficulties in maintaining concentration, persistence, or pace." While the functional categories are not identical, there is enough medical evidence of record regarding the six listed child's functional domains to show that D.J.I. did not suffer from "marked" impairment or difficulties in age-appropriate cognitive / communication functioning, social functioning, personal functioning, or concentration, persistence, or pace.

Comparing the ALJ's findings in the child's six domains of functioning listed in 20

C.F.R. § 416.926a with the four domains in Listing 112.04(B), the ALJ found that D.J.I.'s speech is understood "100%" by his teachers, his language skills are reported to be within normal limits, and he is "mainstreamed" in all classes despite spending one hour a day in a special education resource class.  (Tr. 20).  There is substantial evidence that D.J.I. does not suffer from "marked" impairment in age-appropriate cognitive/communication function.  The ALJ found that one teacher reported D.J.I. enjoys being with adults more than his peers; that he was reported by his teachers to be "below average" in making and keeping friends; and that his mother testified to his bad temper and bad conduct marks in school.  (Tr. 22).  However, the ALJ also noted that D.J.I. is able to ride the bus home by himself and that there are reports of inconsistent treatment and medication non-compliance.  *Id*.  Substantial evidence supports that D.J.I. did not suffer from "marked" impairment in age-appropriate social functioning.  The ALJ noted D.J.I.'s testimony that he sometimes wears his clothes inside out and has to be reminded to conduct personal hygiene.  (Tr. 23).  He also found that the consultative exam indicated D.J.I. "overall has adequate emotional control" and that there were "no allegations of physical problems that are disabling."  (Tr. 23-24).  There is substantial evidence that D.J.I. did not suffer "marked" impairment in age-appropriate personal functioning.  The ALJ found that D.J.I. "mostly does his homework by himself", likes to draw, listen to music, and play with a Gameboy, and found that one teacher reported "average ability" while another reported "below average ability" in being able to "remember what he just heard, to retain information from week to week, and to follow oral instructions".  (Tr. 21).  There is substantial evidence that D.J.I. does no suffer from "marked" difficulties in maintaining concentration, persistence, or pace.

The bulk of medical evidence suggests at most "less than marked" limitations in the

domains of social functioning, as opposed to "marked" or "extreme" limitations in any categories.  Plaintiff contends that the ALJ "ignores or mis-characterizes" the medical evidence. (Pl. Br. 19).  However, the ALJ explained his reasons for giving less weight to certain records of Drs. Collins and Cook, (Tr. 24-25), primarily because more recent records from those doctors suggest that D.J.I.'s mental health has been improving.  The ALJ is free to reject any physician's opinion when the evidence supports a contrary conclusion. *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).  While the ALJ did not specifically reference the opinions of Dr. Gleason, the ALJ is not required to articulate all of the evidence he reviewed.  *See, e.g., Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994) ("That [the ALJ] did not follow formalistic rules in his articulation compromises no aspect of fairness or accuracy that this process is designed to ensure.").

Two non-examining DDS psychologists reviewed D.J.I.'s medical records and opined on the six domains of functioning.  (Tr. 209-214, 241-246).  Both of them found no limitations in the domains of moving about and manipulating objects and health and physical well-being. *Id*. Dr. White found "less than marked" limitations in acquiring and using information, while Dr. Phelan found no limitations in that domain. *Id*.  Both of them found "less than marked" limitations in the domains of attending and completing tasks and interacting and relating with others. *Id*.  Dr. Phelan found "marked limitations" in the domain of caring for yourself, while Dr. White found "less than marked" limitations in that domain. *Id*.  Both psychiatrists opined that D.J.I.'s severe impairments did not meet, medically equal, or functionally equal a listing. *Id*. Both opined that his limitations were not fully supported by the medical evidence of record.  (Tr. 214, 246).  The ALJ ultimately adopted the September 7, 2006, report of Dr. Phelan, with the exception of finding "less than marked" instead of "marked" limitations in the domain of "caring

for yourself". (Tr. 24, 209-214).

The ALJ's decision is supported by substantial evidence in the record, and any legal

error

was, at most, harmless.

**RECOMMENDATION:**

For the foregoing reasons, it is recommended that the District Court enter its order

AFFIRMING the decision of the Commissioner and its judgment DISMISSING this action with

prejudice.  A copy of this recommendation shall be transmitted to counsel for the parties.

Signed this 13th day of May, 2010.

WM. F. SANDERSON, JR.
UNITED STATES MAGISTRATE JUDGE

NOTICE

A copy of this report and recommendation shall be served on all parties in the manner
provided by law.  Any party who objects to any part of this report and recommendation must file
specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1);
Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or
recommendation to which objection is made, state the basis for the objection, and specify the place
in the magistrate judge's report and recommendation where the disputed determination is found.  An
objection that merely incorporates by reference or refers to the briefing before the magistrate judge
is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing
the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by
the district court, except upon grounds of plain error.